(C. D. 600)

General Aniline Works, Inc. *v.* United States

United States Customs Court, First Division

(Decided March 11, 1942)

*Eugene R. Pickrell* and *Eugene A. Chase* for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Richard F. Weeks,* special attorney), for the defendant.

Before Oliver, Walker, and Tilson, Judges

Tilson, Judge: This suit against the United States was brought at the port of New York to recover certain customs duties claimed to have been illegally exacted upon a certain importation designated on the invoice as "Amido Azo Benzol Disulfonic acid." The collector classified the merchandise as a color acid under paragraph 28 of the act of 1930, and assessed the same with duty at 7 cents per pound and 45 per centum ad valorem.

The plaintiff makes various claims for lower rates of duty, among which is the claim at 7 cents per pound and 40 per centum ad valorem under paragraph 27 of the same act, and specifically under subparagraphs 3, 4, and 5 thereof.

Prior to the trial it was stipulated in open court by counsel for the respective parties that:

The imported commodity is none of the commodities mentioned by name in paragraph 28, except possibly a color acid; and that it is a product which is obtained, derived, or manufactured in whole or in part from the product mentioned in paragraph 1651, benzene, and that it is similar in use to the products mentioned by name in paragraph 27; and the importer's attorney agrees to abandon the claims under paragraphs 1 and 5, thereby limiting the issue as to whether or not this product belongs under paragraph 28, as a color acid, or is under paragraph 27.

The pertinent parts of the competing paragraphs read as follows:

Par. 28. Coal-tar products:
(a) * * * color acids, * * * all the foregoing products provided for in this paragraph, when obtained, derived, or manufactured in whole or in part from any of the products provided for in paragraph 27 or 1651; * * * 45 per centum ad valorem and 7 cents per pound.

Par. 27. Coal-tar products:
(3) all products, by whatever name known, which are similar to any of the products provided for in this paragraph or in paragraph 1651, and which are obtained, derived, or manufactured in whole or in part from any of the products provided for in this paragraph or in paragraph 1651;
(4) all mixtures, including solutions, consisting in whole or in part of any of the foregoing products provided for in this paragraph, except sheep dip and medicinal soaps;
(5) all the foregoing products provided for in this paragraph, not colors, dyes, or stains, color acids, color bases, color lakes, leuco-compounds, indoxyl, indoxyl compounds, ink powders, photographic chemicals, medicinals, synthetic aromatic or odoriferous chemicals, synthetic resinlike products, synthetic tanning materials, or explosives, and not specially provided for in paragraph 28 or 1651, 40 per centum ad valorem and 7 cents per pound.

Counsel for the plaintiff then offered in evidence a representative sample of the merchandise, and the same was received without objection and marked exhibit 1.

William Carroll Wilhelm, called as a witness for the plaintiff, testified that he was employed by the plaintiff herein, manufacturers of intermediates and dyestuffs, as analytical chemist, which posi-

tion he had held for about 11 years and that his duties consisted of supervising the analytical work pertaining to raw materials and intermediates, and the finished products produced by the plant; that he had studied chemistry in the years 1914 to 1918 at the Pennsylvania State College and had received the degree of Bachelor of Science in chemistry from that institution; that since his graduation he had been continuously engaged in analytical work of the same character as at present; that he had first worked with the Grasselli Dyestuff Corporation and then with the General Aniline Works, Inc.; that he had received a portion of exhibit 1 and had carefully dried it and found that it contained 43 per centum water and 57 per centum dry material.

The witness then produced a sample of exhibit 1 that had been so dried and the same was received in evidence as exhibit 2. He further testified that upon exhibit 2 he made tests for the water soluble content, the inorganic salts, carbon, hydrogen, nitrogen, and sulphur and found the water insoluble to be $2\frac{1}{2}$ per centum, leaving $97\frac{1}{2}$ per centum soluble; that he found the sodium sulphate to be 12 per centum; the sodium chloride to be $\frac{3}{10}$ per centum, and a trace of lead amounting to 10 parts in a million.

He then took a known weight of exhibit 2, dissolved it in distilled water and filtered off the insoluble material; then the filtrate from this water insoluble material he acidified with hydrochloric acid, and cooled it with ice to a temperature of about 10° or 15° C., and treated this with a standard solution of sodium nitrate. He observed that a definite amount of this sodium nitrite solution was consumed, which is a positive test in organic analyses of the presence of an amino group, $NH_2$ group; from the amount of the sodium nitrite solution consumed, and assuming that this exhibit 2 might possibly be the disodium salt of sulfonic acid, having previously determined the presence of sodium sulphate, of molecular weight of 401, he calculated the purity of exhibit 2 to be 90.2 per centum; that this has led him to believe that exhibit 2 was a sodium salt rather than a free acid; that from the total of the impurities and the 90.2 per centum purity he had found, he had obtained a total of well over 100 per centum, which led him to believe that exhibit 2 was a monosodium salt with a molecular weight of 379 rather than disodium salt; that his further analyses confirmed him in that belief, and that from the amount of combined sulphur found, which amounted to 14.3 per centum, from the amount of impurities which summed up to about $14\frac{1}{2}$ per centum and from the purity of 85.2 per centum found, which gave a summation of about $99\frac{1}{2}$ per centum, he had concluded that this product must be a monosodium salt of amido azo benzol disulfonic acid.

This formula the witness then produced and the same was admitted in evidence as illustrative exhibit A. The witness then testified that

the imported product was a monosodium salt of amido azo benzol disulfonic acid, about 85 per centum pure.

The witness testified on cross-examination that the only difference between exhibit 1 and exhibit 2 was that exhibit 2 was exhibit 1 dried; that he had experimented with compounds substantially similar to the sample he had analyzed in this case; that he had never made a dye from such a product; that a disulfonic acid has two sulfonic groups; that a monosodium salt of disulfonic acid has one of the hydrogen ions in one of the sulfonic groups which is replaced by sodium; that, referring to illustrative exhibit A, there are present two sulfonic groups, which is $SO_3H$ and on the one H has been replaced by sodium; that gave a monosodium salt of the disulfonic acid where there had been two $SO_3$ groups present, and that he had found exhibit 2 to be the monosodium salt; that the one group is a salt and the other an acid; that exhibit 2 was both an acid and a salt.

The witness also testified that the imported commodity was an acid salt which was 50 per centum acid and 50 per centum salt; that it had the properties of both an acid and a salt; that a salt did not give an acid reaction; and that the imported commodity was a salt and not an acid.

Harry Wilhelm Grimmel, testifying for the plaintiff, stated that he had studied chemistry at the University of Goettingen for 4 years, 1918 to 1922, and had received the degree of Ph. D., that from 1922 to 1926 he had been employed by the Farbenfabriken Vormals Friedrick Bayer, in Leverkusen, Germany, as a production chemist, supervising production and research as a side-line; that the products supervised were azo dyestuffs; that he had had nothing to do with the production of amino azo intermediates; that he made coal-tar dyes from amino azo intermediates; that in the year 1926 he had come to the United States and obtained employment with Grasselli Dyestuff Co., the predecessor of General Aniline Works, Inc., by which concern he was still employed, now as plant manager; that his duties consisted of supervising production, administration, and research work; that the products were all kinds of dyestuffs with the exception of vat colors and sulphur colors.

On cross-examination the witness testified that a coal-tar acid is a coal-tar compound; that exhibit 1 is a coal-tar compound; that a color acid is a coal-tar compound with a free acid group, if there is only one carboxyl group or sulphonic group; that in exhibit 1 one sulphonic group is free, the other neutralized; that "the analogue would be bisulphate, where you have also one of the ions replaced by sodium, and you would consider that an acid salt"; that exhibit 1 can be combined further with alkalis as a neutral sulphate, the same as is the

case with bisulphate, but that that ability is no criterion for the whole sulphonic group, as phenol, for example, is not an acid; that illustrative exhibit A shows one sulphonic group (Na) which has been neutralized, and one sulphonic group ($SO_3H$) which has a free acid; that the whole molecule as shown by illustrative exhibit A is an acid salt, and that "By neutralizing the free sulfonic group you get the neutral sodium salt on the so far remaining free sulfonic acid group, thereby creating disodium salt of amidoazobenzol disulfonic acid"; and that is the same chemical formula as Fast Yellow Y. A., as shown by illustrative exhibit B.

This witness concluded his testimony by stating that by adding sodium hydroxide or sodium carbonate to the imported merchandise you produce a dyestuff but not a commercial dyestuff; that it is an impure dyestuff and not the same as Fast Yellow Y. A., for though it has the same chemical formula it does not have the same properties, that is, it does not dye the same; it does not have the same strength nor the same impurities, by which is meant trisulfonic acid and disulfonic acid, which, when Fast Yellow is made, entails as loss from the mother liquid when purified, of 20 per centum; that tetrabromfluorescein is a color acid; that the acid which upon neutralization produces Congo Red is a color acid; that these color acids differ from exhibit 1 in being pure, insoluble in water, and all containing free hydrogen atoms; that sodium bicarbonate contains a free hydrogen atom and is unquestionably a salt.

After reading paragraph 27 of the act of 1930, the witness testified that there were three products mentioned therein by name which were used in the manufacture of dyes by processes similar to the one he had described whereby he had made dyes from exhibit 1; that these three products were aminosalicylic acid, metanilic acid, and sulfanilic acid. The witness testified that exhibit 1 was an acid salt and not a color acid; that it was not a color acid because the usual definition of a color acid was that of a coal-tar compound with a free acid group, insoluble in water generally, and which requires an alkali in order to form a soluble sodium or potassium salt; that exhibit 1 did not conform to these requirements due to its partly neutralized character, easily soluble in water, and it does not have any dyestuff; that when neutralized with soda it does not make a commercial dye, whereas you would make a commercial dye with a color acid upon treatment with neutralizing soda; that exhibit 1 was not a free acid.

The witness continued with his testimony to the effect that the plaintiff herein did not import merchandise the same as exhibit 1 in 1930; that he had manufactured coal-tar dyes from aminosalicylic acid intermittently from 1922 to date; that over the same period he had done the same with metanilic acid compound and sulfanilic acid;

that he had been continuously engaged from 1926 to date in the manufacture of coal-tar dyes and coal-tar intermediates in the United States; that a so-called dye, such as Diamond Black F, is made from aminosalicylic acid by diazotizating the latter and combining with alpha-naphthylamine, which intermediate compound is again diazotized and combined with one napthol five sulphonic acid, and that this combination is a chemical combination.

Counsel for the defendant then admitted that the imported merchandise was similar to three acids provided for by name in paragraph 27 to wit: aminosalicylic acid, metanilic acid, and sulfanilic acid.

The witness further testified that intermediates were produced and from those intermediates coal-tar dyes were produced; that he had seen a product the same as exhibit 1 manufactured in Germany in 1924 and 1925; that he was familiar with this particular importation having used it as an intermediate for making coal-tar dyes. He then described the manufacture of merchandise the same as exhibit 1 as the sulphonation of aminoazobenzene, which is obtained from benzene and salting out the resulting amidoazobenzol with sodium chloride at the freezing point.

The witness also testified that the General Aniline Works, Inc., had imported merchandise the same as exhibit 1 during 1934 and 1937; that those importations were used exclusively for the manufacture of a product known as Mono Aso dyestuffs of the type of Fastusol Brown L. G. A., or Fast Scarlet B. A.; that during 1938 the importations of merchandise the same as exhibit 1 were used 90 per centum in the manufacture of mono azo dyestuffs and 8 per centum in the manufacture of Fast Yellow Y. A., that the Fastusol Brown L. G. A. was made by subjecting exhibit 1 to the process of diazotization and combining this diazo compound with metatoluidine, and upon this product being obtained, phosgene was allowed to react; that the combination was a chemical combination; that Fast Scarlet B. A. was made by subjecting exhibit 1 in the same way as described before, to the action of nitrous acid and combining this product with beta-napthol and that combination was a chemical compound, a dyestuff; that Fast Yellow Y. A. was a purification of the intermediate obtained from abroad, represented by exhibit 1; that this material was purified by dissolving exhibit 1 in water, adding caustic soda, or soda, to bring it into solution, adding nuchar (a bone char) and after filtration from the nuchar the material is salted out by the addition of common salt, or sodium chloride, and that this process entails a loss of about 20 per centum.

The third witness for the plaintiff, Walter McMillan Ralph, testified that he was a chemist by profession; had studied chemistry at Cornell University from which institution he received a degree of

Bachelor of Chemistry in 1915; that since that date he had continuously followed the profession of chemistry; that he had taught chemistry in the University of Buffalo, and that since 1917 he had been employed by the National Aniline & Chemical Co. at their Buffalo, N. Y., plant as research chemist, operating chemist, assistant director of research and development, and since May 1, 1929, as director of research and development; that he had seen manufactured at the Buffalo plant monosodium salt of amino azo benzene disulfonic acid. This process was described as follows:

In the process amino azo benzene is charged into 26% oleum, in a jacketed cast iron kettle, where under proper conditions of agitation and of temperature control, it is converted into the disulfonic acid of amino azo benzene. This product is then isolated as the monosodium salt by diluting the sulphonation mass with water and ice, and by adding sodium chloride.

The witness further testified that from 1918 to date the National Aniline & Chemical Co. had been manufacturing monosodium salt of amino azo benzene disulfonic acid, the same as exhibit 1; that during the period he served as operating chemist he had experience in the manufacture of dyes from merchandise the same as exhibit 1; that the diazotization process and a chemical coupling had been used; that in the manufacture of coal-tar dyes and processes which are similar to those used by the plaintiff in making coal-tar dyes with merchandise the same as exhibit 1, there had been used the following products provided for by name in paragraph 27, to wit: Aniline oil, benzidine, cumidine, dianisidine, naphthylamine, metanilic acid, sulfanilic acid, toluidine, tolidine, xylidine; that the monosodium salt of amino azo benzol disulfonic acid is made from benzene.

The witness gave further testimony concerning a publication by the United States Tariff Commission, known as the "Synthetic Organic Chemicals," which was admitted in evidence as exhibit 3. All this testimony as well as the exhibit have had our careful consideration, but it is not believed necessary to set the same out here in detail. The witness then testified as follows:

Exhibit 1 is similar in appearance to the material that we manufacture at Buffalo, and from that similarity and from my knowledge I would say that it was a monosodium acid salt.

 *     *     *     *     *     *     *

According to my understanding the term "color acid" is analogous to the term "color base," and in each case the reference is to products which are not these dyestuffs and have no particular utility per se, but which can be converted into commercial dyestuffs by salt formations in the case of color base formation of salts with acids and in the case of color acids the formation of salts with basic material, whereby then the products become soluble, take on color and the properties of dyestuffs and become commercial offerings.

Q. Would you consider exhibit 1 here to conform to that?—A. To my mind that is not a color acid in the sense in which I understand the term.

Q. In your conception of the term it is not a color acid?—A. It is not a color acid.

On cross-examination the witness again stated that he did not consider exhibit 1 to be a color acid because it does not require the addition of caustic soda, either to develop its color or to make it soluble, or to put it in a form for sale for use as a dyestuff.

On this record we are asked to determine first of all whether or not the imported merchandise is a color acid. In order to answer this question we must know what constitutes a color acid. The defendant gives us no definition of the term. The plaintiff, through two witnesses, gives us two definitions, which though not in identical language, appear to cover the term. One of these definitions is contained in the preceding quotation, and the other is as follows:

The usual definition of a color acid is that of a coal-tar compound with a free acid group, insoluble in water, generally, and which requires an alkali in order to form a soluble sodium or potassium salt.

From the above definitions it appears that a color acid is a coal-tar compound which is not a dyestuff and which requires that any free acid group in the compound be neutralized by an alkali in order to form a soluble sodium or potassium salt whereby the product takes on color and the properties of a commercial dyestuff. Two witnesses testified definitely that the imported merchandise was not a color acid, although giving entirely different reasons for their respective answers. One witness stated in substance that exhibit 1 does not meet the requirements of a color acid because of its partly neutralized character, easily soluble in water, and it does not have any dyestuff; that when neutralized with soda it does not produce a commercial dye as would be the case were a color acid neutralized with soda, and that it is not a free acid. The other witness stated that:

This product here does not require the addition of caustic soda, either to develop its color or to make it soluble, or to put it in a form for sale for use as a dyestuff— none of those things.

Although differing in their reasons, which in some respects appear to be somewhat conflicting, the conclusion was reached by both witnesses, qualified chemists with years of experience in the manufacture of coal-tar dyes and intermediates the same or substantially the same as the imported merchandise, that the imported merchandise is not a color acid. This conclusion thus reached has not been disturbed or weakened by any evidence offered by the defendant.

All the witnesses were in accord that the imported merchandise was the monosodium salt of amido azo benzol disulfonic acid, known as an acid salt, which is not an acid but a salt with the properties of both an acid and a salt.

Counsel for the defendant, in his brief filed herein, contends that the imported merchandise is a color acid because the plaintiff claims that it is an acid under paragraph 1, because it is so described on the invoice,

that this is evidence that commercially it is an acid, and that chemically it retains the properties of an acid and will continue to do so until completely neutralized.

We have examined the record in the light of the above contentions and find that the plaintiff's claim under paragraph 1 was abandoned before any testimony was taken, and therefore any question which might have arisen by reason of such claim is not now before us. The mere fact that the plaintiff claimed the merchandise dutiable as an acid and subsequently abandoned such claim is no evidence that the merchandise is in fact an acid.

The item on the invoice describing the merchandise here in question is as follows:

6 drums Amido Azo Benzol Disulfonic acid.

A good portion of the testimony consists of proof that the commodity thus described is in fact a monosodium salt, commercially known as an acid salt. The invoice description as an acid as against uncontradicted evidence that it is not an acid is no evidence that the imported merchandise is commercially an acid. The record shows that the partially neutralized molecule of the imported merchandise retains the properties of an acid, but with the added properties of a salt, and that results in something other than an acid.

As supporting his contention that the imported merchandise is an acid color, counsel for the defendant quotes from the testimony as follows:

* * * that exhibit 1 is a coal-tar compound; that if a coal-tar compound has only one acid group and that acid group is free, it is a color acid * * *.

The record shows that the same witness testified as follows:

X. Q. Now a color acid is a coal-tar compound with a free acid group. That is the next requisite, is it not?—A. If there is only one carboxyl group or sulphonic group in the molecule there is no doubt.

X Q. Has exhibit 1 a free acid group?—A. * * * As your Honor heard before, one group is free, the sulphonic group; the other one is neutralized. The analogue would be bisulphate, where you have also one of the ions replaced by sodium, and you would consider that an acid salt.

Apparently counsel for the defendant has placed too much emphasis upon the "one free acid group" without giving proper regard to the qualification "only one" in the hypothetical coal-tar compound which counsel was endeavoring to reveal as a color acid, and in failing to give proper consideration to succeeding testimony wherein the witness explained that the actual coal-tar compound here involved had two acid groups, one of which had been neutralized. All of this testimony tends to overcome the classification rather than sustain it.

Counsel for the defendant also contends that the record clearly shows that the present importation is a color acid because it is not necessary that a color acid be insoluble in water, and he buttresses

his contention with a quotation from a footnote found in the Dictionary of Applied Science, which states that:

Some of the disulphonic acids  *  *  *  are insoluble in water.

From this counsel for the defendant concludes that:

This shows, not only that water insolubility is *not a test of a color acid*, but that it was inaccurate and misleading for Dr. Grimmel to allow the question of water solubility or insolubility to enter into his opinion that the importation is not a color acid.

With the above conclusions we cannot agree. It should be remembered that Dr. Grimmel was testifying as a chemist backed by long experience in dyemaking, and there appears to be nothing misleading in his including in his "usual definition" of color acid a characteristic thereof expressed by the phrase "insoluble in water, generally." While it is true that solubility or insolubility in water, in and of itself, is not an infallible test of a color acid, the fact that a substance under analysis is soluble in water, that it departs from a general characteristic, may very properly be taken into consideration along with other unquestioned tests and be included in a definition of a color acid, especially so where the usual character of insolubility is qualified, as was done by the witness in this case. Be that as it may, the court has not been misled by the testimony of Dr. Grimmel, and we are unable to see how his definition "clearly indicates that the imported commodity is a color acid."

Counsel for the defendant in his brief continues:

So in spite of Dr. Grimmel's opinion, the testimony shows that General Aniline did make a commercial dye out of merchandise such as the importation.

One might infer from this that somewhere in Dr. Grimmel's testimony there was a denial that a commercial dye can be obtained from merchandise such as the imported merchandise. We find nothing in the record to this effect. Dr. Grimmel did testify that when exhibit 1 is neutralized with soda no commercial dye is made, whereas the same treatment on a color acid would produce a commercial dye, and that by merely adding sodium hydroxide or sodium carbonate to the importation, you have produced a dyestuff, but not a commercial dyestuff.

The witness then explained that the noncommercial dyestuff differed from the commercial dyestuff, Fast Yellow Y. A., obtained by the purification process, in that that method entailed, besides the neutralization with soda, the separation from the mother liquid 20 per centum of the component chemical elements, namely trisulfonic acid or disulfonic acid, which are considered impurities. In other words, all that is denied by Dr. Grimmel is that a commercial dye can be obtained from a commodity such as the importation here by merely neutralizing with soda or some other chemical named. The

witness sets forth the method of obtaining several commercial dyes, by the proper chemical treatment, from merchandise such as that in this case. That commercial dyes can be obtained, by proper treatment, from the involved merchandise is nowhere denied by anyone. That is not the point in this case. It is the contention of the plaintiff that the imported merchandise is not a color acid.

After a careful examination of the record, we are unable to agree with the contention of the defendant that the testimony clearly indicates the imported merchandise is a color acid. On the contrary the plaintiff has established, according to the only definition of a color acid before us, by the uncontradicted testimony of qualified chemists that the imported merchandise is not a color acid.

We find the following in the brief of counsel for the defendant:

Whittaker says: The acid dyestuffs are usually put on the market in form of the sodium salt of their sulphonic acid, though some are put on the market as the lime salt, e. g. patent blue.

We also find in the paragraph immediately preceding the above quotation, introducing the subject of "Acid Dyestuffs," at page 28, "Dyeing with Coal Tar Dyestuffs," the following:

Despite the variety of colors from the chemical point of view they are all one class from the dyeing point of view in that they require to be dyed from an acid-dye bath, hence the name "Acid Dyestuffs."

Here is a clear indication that the term "acid" dyestuffs has no allusion to the acid component in the material, but merely to the method of obtaining the dyestuff. Thus by the mouth of his own witness, Whittaker, is destroyed any argument that the term "acid" dyestuffs is any indication that the imported merchandise is a color acid.

In support of his argument and contentions counsel for the defendant cites the case of *United States* v. *Merck*, 8 Ct. Cust. Appls., 141. In that case the appellate court affirmed a decision of this court sustaining the importer's claim for free entry as phosphoric acid under paragraph 387 of the act of 1913, of what was found to be an acid anhydride, which scientifically speaking might not be an acid at all, because it appeared from catalogs and price lists in evidence in that case that drug and chemical firms carried phosphoric anhydride as an acid and as a form of phosphoric acid. This is in sharp contrast with the present record which contains nothing as to commercial practice, except the statement by one witness that:

\* \* \* my understanding of the term "color acid" is that it is a term of infrequent and very specific use in the dyestuff industry.

We quote the following from the *Merck* case, *supra:*

\* \* \* The question in the case, therefore, is whether phosphoric anhydride is generally, uniformly, and definitely known to the trade as phosphoric acid and bought and sold by the trade under that designation.

\*    \*    \*    \*    \*    \*    \*

From catalogues and price lists introduced in evidence it appeared that drug and chemical firms carried phosphoric anhydride as an acid and as a form of phosphoric acid. It also appeared that whether the anhydride is invoiced as phosphoric acid anhydride, or as acid phosphoric anhydride, or as phosphoric anhydride, the same article is meant, and that to the trade those designations uniformly and always signify a single definite form of phosphoric acid, and merchandise of the kind here involved. From that evidence we conclude that phosphoric anhydride is, commercially speaking, a form of phosphoric acid.

The present record contains nothing to show that the imported merchandise was generally, uniformly, and definitely known in the trade as a color acid and that it is so bought and sold in the trade.

Having determined that the imported merchandise is not a color acid, we come now to a consideration of the question of whether or not it is one of the substances made dutiable under paragraph 27, as claimed by the plaintiff.

By the testimony of three exceptionally well-qualified witnesses it has been established that the imported merchandise is monosodium salt of amino azo benzene disulfonic acid, chemically known as an acid salt; that it is derived from benzene, one of the products provided for in paragraph 1651; that there are several products (aminosalicylic acid, metanilic acid, and sulfanilic acid) mentioned by name in paragraph 27 which are used in the manufacture of dyes by processes similar to the process by which dyes are made from the imported merchandise.

The products named in subparagraph 5 of paragraph 27, *supra*, are all mentioned by name in paragraph 28. By the stipulation of fact entered into by and between counsel for the respective parties, hereinbefore set out, the imported merchandise is none of the commodities mentioned by name in paragraph 28. Therefore, the proviso of subparagraph 5 does not, in this case, affect the products covered by subparagraphs 3 and 4 of paragraph 27. The record also shows that the imported merchandise is derived from benzene, a product provided for in paragraph 1651, and is similar in use to the products mentioned by name in paragraph 27.

After a careful consideration of the entire record, we hold that the imported merchandise is not dutiable as a color acid, as classified by the collector, but is properly dutiable under paragraph 27 (3) of the act of 1930, as claimed by the plaintiff, at 40 per centum ad valorem and 7 cents per pound. Judgment will be rendered accordingly.